Robert H. JONES and Ethel I. Jones

v.

NORTHAMPTON COUNTY TAX AS-
SESSMENT OFFICE, Northampton
County Tax Claim Bureau, and North-
ampton County.

Appeal of NORTHAMPTON COUNTY
TAX CLAIM BUREAU,
Appellant.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Sept. 9, 1996.
Decided Feb. 5, 1997.
As Amended Feb. 27, 1997.

Keene Jabbour, Easton, for appellants.

Charles Bruno, Easton, for appellees.

Before SMITH and FLAHERTY, JJ., and
NARICK, Senior Judge.

FLAHERTY, Judge.

Northampton County Tax Assessment Of-
fice, Northampton County Tax Claim Bu-
reau, and Northampton County (collectively
Appellants) appeal from an order of the
Court of Common Pleas of Northampton
County (trial court) which sustained the ap-
peal of Robert and Ethel Jones (Appellees)
from the determination of tax liability by
Northampton County. We affirm.

Appellees owned over 103 acres of adjoin-
ing parcels of real estate. The parcel at
issue, identified by the Northampton County
Tax Assessment Office as J6–5–26, consists
of seventy-seven acres of quarry, wasteland,
and woodland. Northampton County
adopted the provisions of Act 515 which is
officially titled "[a]n Act [e]nabling certain
counties of the Commonwealth to covenant
with land owners for preservation of land in

farm, forest, water supply, or open space uses."[1] In December of 1977, Appellees entered into a covenant (Covenant), pursuant to Act 515, with Appellant County whereby they agreed not to change the use of the subject property for a period of ten years. In exchange, Appellants gave Appellees preferential tax treatment for J6-5-26 pursuant to Act 515. Additionally, Appellees entered into separate covenants regarding the other parcels.

In 1994, Appellees sold the entire 103 acres to the Southmoore Golf Course Associates, L.P. (Southmoore). From 1977 until the sale to Southmoore, J6-5-26 remained vacant open land with water from the quarry being used to irrigate adjoining farmland. After the sale to Southmoore, J6-5-26 was not altered, i.e., the premises remained unchanged and the quarry was still used to irrigate the adjacent land which had now been turned into a public golf course. Additionally, a new pump house was built to replace the existing pump house which formerly irrigated the adjoining farmland before it became a golf course.

The Appellant County contended that a breach of the Act 515 covenant occurred in 1994 regarding all the parcels including J6-5-26.[2] Thus, Appellant County notified Appellees of the alleged breach by letter dated October 26, 1994, stating that rollback taxes in the amount of $38,165.61 were due on all of the parcels. Appellees paid $22,014.71 of this rollback assessment but refused to pay the $16,150.90 levied against the quarry property in question because they did not believe that there was a breach of the Covenant pertaining to that parcel. Appellees appealed to the trial court which found that there was not a breach of the Covenant and sustained Appellees' appeal.

■ The question presented in this appeal is whether the trial court erred in concluding that the use of the seventy-seven-acre property, designated as J6-5-26, has not changed and in permitting Appellees to maintain Act 515 preferential tax treatment for that property. Our scope of review in tax assessment appeals is very narrow and is limited to a determination of whether the trial court committed a clear error of law or abuse of discretion. *Pennypack Woods Home Ownership Association v. Board of Revision of Taxes,* 163 Pa.Cmwlth. 80, 639 A.2d 1302, 1303 (1994). The trial court's findings are given great weight by the Commonwealth Court in tax assessment appeals. *Id.* The issue thus becomes whether the trial court committed an error of law or abused its discretion when it concluded that the use of the quarry, as a water supply to irrigate adjoining parcels, had not changed just because adjoining land using the water was a golf course instead of farmland.

■ In *Deigendesch v. Bucks County,* 505 Pa. 555, 482 A.2d 228 (1984), our Supreme Court stated that the "obvious intent of the legislature in enacting Act 515 was to preserve farms, forests, water supplies and open spaces in the Commonwealth." *Id.* at 562, 482 A.2d at 231. Appellants argue that the trial court should have given greater weight to the rationale in *Greenbelt Associates Appeal,* 5 D. & C.3d 557 (1978). In *Greenbelt,* the Court of Common Pleas of Bucks County held that where a public highway bisected the taxpayer's property, restricted in its entirety by one covenant, into a northern and a southern tract, building construction on the northern tract constituted a breach as to the entire parcel. *Id.* at 560. However, the trial court in the case *sub judice* correctly ruled that *Greenbelt* was not binding authority and found that there was no division of property. We cannot disturb this finding absent an abuse of discretion or an error of law. Recognizing that, in the instant case, there is no legal or physical division of the subject property, Appellants argue that there is a "symbiotic relationship" between the golf course and the quarry because the golf course relies on the water supply from the

---

1. Act of January 13, 1966, P.L. (1965) 1292, *as amended,* 16 P.S. §§ 11941–11947. This legislation is commonly known as "Act 515."

2. Section 4 provides that a ten-year covenant is automatically renewed in one-year intervals unless either of the parties gives notice to terminate at least thirty days prior to any anniversary date of entering the covenant. The covenant continues for ten years for every year that no notice is given. 16 P.S. § 11944.

quarry to maintain its greens. However, we agree with the trial court that the subject property is a tax parcel in itself independently restricted by a covenant separate and distinct from the golf course. Therefore, we are limited to evaluating the use of parcel J6–5–26 only and not the use of any adjoining property because only a change in use of J6–5–26 can breach the Covenant at issue in the instant case.

Appellants next argue that using the water supply on the subject property to maintain the adjacent golf course is a change in use of the property constituting a breach of the Covenant. We have previously held that an alteration in use will constitute a breach of a covenant between a land owner and a county, *Appeal of Pfirrmann,* 63 Pa.Cmwlth. 407, 437 A.2d 1336, 1338 (1981), however, our Supreme Court held that a change in use is not the only form of breach. *Deigendesch,* 505 Pa. at 563–64, 482 A.2d at 232. Additionally, Section 6 of Act 515 provides that "[i]f the land owner, his successors, or assigns, while the covenant is in effect, alters the use of the land to any use other than that designated in the covenant, such alteration shall constitute a breach of the covenant." 16 P.S. § 11946. Therefore, in order to determine whether using the water in the quarry to irrigate a golf course instead of farmland constitutes a change in use such that the Covenant is breached, we must examine the terms of the Covenant and the nature of the property.

The subject property is an abandoned slate quarry consisting of the waste from the quarry banks and approximately ten acres of water. The remaining portion of J6–5–26 is woodland and wasteland. Paragraph two of the Covenant provides the following:

2. COVENANT. The owner(s) hereby covenant(s) for themselves and their successors and assigns in right, title and interest that the land, described in the attached Exhibit "A", will remain in such open space use as designated in the exhibit, attached hereto and marked Exhibit "B", and will not be used for any other purpose or put to any other use than that set forth in the said Exhibit "B", for a

period of ten (10) years, commencing with the date of this covenant.

Exhibit A itemizes only the subject property. The Covenant provides that the quarry will remain in "such open space use" as provided in Exhibit B. Exhibit B is a form document which restricts the use of the subject property to "woodland and wasteland" as a subcategory of farmland. Farming operations were never conducted on the subject premises. The only place on the entire exhibit where the terms "woodland and wasteland" appear is under the category of farmland. Therefore, the terms "woodland and wasteland" apply to the wooded portion of the subject property in the only way permitted by the standardized form attachment, under the designation of farmland. The language "such open space use" as restricted to "woodland and wasteland" together restrict the subject property to its use in 1977 which was that of a water-filled quarry adjacent to woodlands. However, the terms "open space," "woodland," and "wasteland" are not defined in the Covenant so we will have to apply the definitions supplied by Act 515.

The term "open space land" is defined in Act 515 in the following manner:

Any land, including farm, forest and water supply land, in common ownership, of at least ten acres in area, in which site coverage by structures, roads and paved areas does not exceed three percent. Open space land includes land the restriction on the use of which could (i) conserve natural or scenic resources, including but not limited to soils, beaches, streams, wetlands, or tidal marshes; (ii) enhance the value to the public of abutting or neighboring parks, forests, wildlife preserves, nature reservations, or other public open spaces; (iii) augment public recreation opportunities; (iv) preserve sites of historic, geologic, or botanic interest; (v) promote orderly urban or suburban development; or (vi) otherwise preserves open space without structures, roads and paved areas exceeding three percent of site coverage.

16 P.S. § 11941(4). The term "water supply land" is defined as "[a]ny land used for the protection of watersheds and water supplies, including but not limited to land used for the

prevention of floods and soil erosion, for the protection of water quality, and for replenishing surface and ground water supplies." 16 P.S. § 11941(3).

Applying these definitions to the subject property in the case *sub judice* demonstrates that the subject property is open space land. First, the quarry is held in common ownership by Southmoore Golf Associates and its seventy-seven acres exceeds the ten-acre threshold required by Act 515. Secondly, the quarry is a water supply that is used to irrigate adjoining land, prevent soil erosion, preserve water quality, and replenish ground and surface water. (R.R. 41–42). The seventy-seven-acre parcel also has the same proportion of woodlands and wasteland as it had at the inception of the Covenant. (R.R. 42–43).

In *Pfirrmann*, we held that, when a landowner constructs a single family dwelling outside the curtilage of an existing dwelling on farmland which is restricted by a covenant under Act 515, there is a change in use that constitutes a breach of the covenant even though the farmland as a whole would still be eligible for entering into a covenant under Act 515. *Pfirrmann*, 437 A.2d at 1338. However, *Pfirrmann* is factually distinguishable from the case *sub judice*. In *Pfirrmann*, the land owner constructed a house thereby increasing the residential uses of the farmland and changing the physical features of the tract. *Id.* The addition of a residential structure actually changed the proportion of residential use with respect to agricultural use, which was a use beyond the restrictions in the covenant.

In the instant case, the subject parcel exists in the state that it was in prior to and contemporaneous with the inception of the agreement. (R.R. 42–43). The physical features and the contours of the subject property did not undergo any changes. (R.R. 52). The parcel remains unaltered as open space land and woodland eligible for preferential tax treatment under Act 515. Therefore, absent evidence in the record that the golf course draws more water than previously demanded by the farmland thereby threatening to change the condition of the property, the trial court did not commit an error of law or abuse its discretion in concluding that use of the water on the subject parcel to irrigate a golf course rather than farmland is not a changed use in breach of the Covenant.

Accordingly, the order of the Court of Common Pleas of Northampton County is affirmed.

### ORDER

AND NOW, this 5th day of February, 1997, the order of the Court of Common Pleas of Northampton County, dated November 13, 1995, at No. 1995–C–1600, is hereby affirmed.